UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA      Case No. 8:10-cv-71-T-17MAP, *et al.*[1]
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD., AND
SCOOP REAL ESTATE, L.P.,
_____/

## OMNIBUS REPORT AND RECOMMENDATION

These cases emanate from a Securities and Exchange Commission enforcement action aimed at dealing with the aftermath of a massive Ponzi scheme perpetrated by a hedge fund manager.[2]  The receiver appointed in that action and charged with rounding up assets has sued more than 150 investors demanding the return of their "false profits."[3]  A subset of these investors, those in the twenty-three cases listed here, points to their arbitration provisions and moves to compel arbitrations per the Federal Arbitration Act (*i.e.,* 9 U.S.C. § 4). The central question their motions ask is straightforward: in which forum should their actions be heard?  I find that an arbitral forum is the appropriate one, and therefore recommend the motions be granted.[4]

_____

[1]  The specific cases covered by this omnibus Report and Recommendation are listed in appendix A which is part of this report.

[2]  *See SEC v. Arthur Nadel, et al.,* Case No.  8:09-cv-87-T-26TBM.

[3]  These type of actions are commonly known as "clawback cases."

[4]  The district judge referred for reports and recommendations the motions to compel arbitration filed in those cases listed in appendix A.  *See* 28 U.S.C. § 636(b); Local Rule

*A. Background*

    *1. the scheme*

Arthur G. Nadel, from his base in Sarasota and under the umbrella of two investment management companies, Scoop Capital, LLC and Scoop Management, Inc., managed six hedge funds over a course of time: Valhalla Investment Partners, L.P., ("Valhalla Investment Fund"), Viking Fund, LLC ("Viking Fund"), Viking IRA Fund, LLC ("Victory IRA Fund"),Victory Fund, Ltd. ("Victory Fund"), Victory IRA Fund, Ltd. ("Victory IRA Fund"), and Scoop Real Estate, L.P. ("Scoop Real Estate Fund") (collectively referred to as the "Hedge Funds").[5] Unfortunately, Nadel kept the books and also kept his investors in the dark about the true state of their investments.  All the Hedge Funds were undercapitalized and over hyped.  Instead of a reported value of hundreds of millions, their worth was more like $500,000.  Instead of earning profits as their account statements in 2008 and 2009 repeatedly stated, they lost money.  Like every Ponzi schemer, Nadel robbed Peter to pay Paul.[6]

---

6.01(b).  The parties have filed omnibus motions and responses regarding the arbitration issues; accordingly, an omnibus report and recommendation dealing with the common questions they raise is appropriate.

    [5] Wiand acts as receiver for these entities and brings these clawback actions on their behalf.

    [6] Nadel plead guilty in the Southern District of New York to a multi-count indictment charging him with securities violations, mail fraud, and wire fraud; the court sentenced him to fourteen years.  *See* The Receiver's Omnibus Opposition to Defendants' Motion to Compel Arbitration and Dismiss Complaint or, Alternatively, Stay Action ("Receiver's Opposition") at p.  8 and Declaration of Gianluca Morello in Support of Receiver's Omnibus Opposition to Defendants' Motion to Compel Arbitration and Dismiss Complaint or, Alternatively, Stay Action ("Morello Declaration") at Exhibit 2.

## 2.  the enforcement action

In January 2009, the SEC brought an emergency enforcement action against Nadel, Scoop Capital, and Scoop Management (identified as "defendants" in that action) and the Hedge Funds (denominated as "relief defendants") contending the defendants had violated Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77e(a)), Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)), and Rule 10b-5 (17 C.F.R. § 240.10b-5).[7] *See SEC v. Arthur Nadel, et al.*, Case No. 8:09-cv-87-T-26TBM.  Not only did the SEC seek declaratory and injunctive relief, an asset freeze, disgorgement, and civil money penalties, it also moved for the appointment of a receiver to manage and preserve all assets belonging to the defendants and the relief defendants.  The district judge appointed Burton W. Wiand ("Wiand") as the receiver for the Hedge Funds and eventually entered a permanent injunction as to Nadel.  *See id.* at docs. 8, 140, 460.

## 3.  clawbacks and arbitration clauses

Since his appointment, Wiand has filed more than 150 clawback actions to recover "false profits" from Hedge Funds investors.  All these cases rely on the same two theories, Florida's Uniform Fraudulent Transfer Act ("FUFTA," *see* Fla. Stat. § 726.101, *et seq.*) and an equitable disgorgement claim based on unjust enrichment.  And all these cases strike the same theme – an investor defendant received Hedge Funds disbursements in excess of his or her principal

---

[7] A "relief defendant," also characterized as a "nominal defendant," has no ownership interest in the property that is the subject of the litigation but is nonetheless joined to aid in the recovery relief.  *See SEC v. George,* 426 F.3d 786, 798 (6th Cir. 2005); *SEC v. Cherif,* 933 F.2d 403, 414 (7th Cir. 1991).

investment (hence, the claim of a "false profit").[8]   These investors, Wiand says, are to be distinguished from the larger group of investors who suffered net losses, and to allow the winners to retain their false profits at the expense of the losers would be inequitable and unjust.

Out of these clawback cases, the Defendants in these twenty-three actions (*see* appendix A) move to compel arbitration per § 4 of the Federal Arbitration Act (FAA).  9 U.S.C. § 4.[9]   All had subscription documents with their associated Hedge Funds as well as either a limited partnership agreement or a limited liability company agreement.   More specifically, investors in both Viking Fund and Viking IRA Fund obtained subscription documents and a limited liability company agreement with nearly identical arbitration provisions; investors in Victory Fund obtained subscription documents and a limited partnership agreement, both containing different arbitration provisions; investors in Valhalla Investment Fund obtained subscription documents and a limited partnership agreement, the latter of which contained an arbitration provision; and investors in Scoop Real Estate Fund obtained subscription documents and a limited partnership agreement, the latter of which contained an arbitration provision.[10]   In most respects, the

---

[8]   Case No. 8:10-cv-203-T-17MAP is the only notable exception.  In that case, Wiand seeks all money transferred to Defendant World Opportunity Fund, L.P., including the "false profits."  Irrespective, the analysis is the same.

[9]   That section provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court … for an order directing that such provision proceed in the manner provided for in such agreement."

[10]   Appendix B to this Report recites the various arbitration clauses pertaining to these clawback actions and annotates which clause governs which action.

arbitration provisions set forth the same general directive.   Each directs that disputes or controversies that arise from the agreements be arbitrated in a particular forum (Chicago, New York City, or Sarasota) before a specific arbitral organization (American Arbitration Association or JAMS) or by a specific class of arbitrator (i.e., a retired judge applying JAMS rules).

B. *Discussion*

1. *the required context*

Congress enacted the FAA in 1925 "in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, __ U.S. __, 131 S.Ct. 1740, 1745 (2011).  The mainstay of the Act provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[11]

The Supreme Court has repeatedly described this directive as evoking a "national policy," or a "liberal federal policy," or a "strong" policy favoring arbitration agreements.  *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984) ("national policy"); *Moses H. Cone Mem'l Hosp.  v.  Mercury Const. Corp.,* 460 U.S. 1, 24 (1983) ("liberal federal policy"); *Dean Witter Reynolds, Inc.  v. Byrd*, 470 U.S. 213, 217 (1985) ("strong" federal policy).  And to effectuate that Congressional command, the Court has repeatedly admonished the lower courts to "place arbitration agreements

---

[11] *Id.* quoting 9 U.S.C. § 2.

on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility*, 131 S.Ct. at 1745 (internal citation omitted).[12]

Accordingly, when faced with a motion to compel arbitration, a court makes a two-step inquiry: did the parties agree to arbitrate the particular dispute at issue; if so, do legal constraints external to the parties' agreement foreclose arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *Klay v. All Defendants,* 389 F.3d 1191, 1200 (11th Cir. 2004). A court looks at these questions with a distinct perspective – a healthy respect for the "national policy" favoring arbitration and an aim toward "rigorously" enforcing such agreements. *Klay*, 389 F.3d at 1200.

### 2. Wiand's arguments against arbitration

Against this context, Wiand gives a bevy of reasons why the Court should deny the Defendants' motions to compel arbitration: (a) Defendants cannot show the agreements are valid; (b) if valid, none bind Wiand; (c) assuming they bind Wiand, a particular subset (those claims relating to transfers from Valhalla Investment Fund and Scoop Real Estate Fund) are not arbitrable based on the language contained in the provisions applicable to those Hedge Funds; (d) compelling arbitration in these cases conflicts with other Congressional policies (i.e., federal securities laws, the receivership scheme for implementing those security laws) or more pressing equitable considerations (i.e., arbitration would be too costly and would unduly dissipate the

---

[12] In *Southland, supra,* the Court reiterated that the FAA was a Congressional exercise of its Commerce Clause power, which since *Gibbons v. Ogden*, 22 U.S. 1 (1824) has been held plenary. 465 U.S. at 11-12.

receivership estate).  But for (c), all fit in *Mitsubishi's* legal-constraints category.  And as to those, Wiand bears the burden for showing that § 2's escape-from-arbitration hatch applies: an arbitration agreement shall be enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000) ("party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue" or that "arbitration would be prohibitively expensive"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (burden on party opposing arbitration to show exception).

### a.  validity challenges – burdens and severability rules

The Supreme Court in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006), recognized two types of validity challenges grounded on § 2's savings clause: one attacks "the validity of the agreement to arbitrate" (citing as an example, *Southland*, *supra*, which dealt with a challenge of the agreement to arbitrate as void under California law as it purported to cover claims under the state Franchise Investment Law); the other challenges the "contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.*  For dealing with these two, the Court culled three "propositions" from its prior FAA cases: (1) an arbitration clause, as a matter of substantive federal arbitration law, is severable from the remainder of the contract; (2) unless the challenge is to the arbitration clause itself, the issue of the contract's validity is to be considered by the arbitrator; and (3) this arbitration law applies in state and federal courts.  *Id.* at 445-46.

*Buckeye*'s three propositions lead to this assumption: when a party presents a presumptively valid contract with an arbitration clause, the district court in most instances sends the dispute to arbitration.  *See e.g., Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 854 (11th Cir. 1992) ("Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration.").  Wiand undoubtedly understands this because he pins his invalidity arguments to the exceptions *Buckeye* did not address but yet recognized as different from the two validity challenges it did discuss.  Namely, *Buckeye* did not speak to "the issue whether any agreement between the alleged obligor and obligee was ever concluded." 546 U.S. at 444 n.1.  Thus, Wiand seizes on examples *Buckeye* did not opine about: whether the alleged obligor ever signed the contract or whether the signor lacked authority to commit the alleged principal (Wiand's *ultra vires* claim).

To that end, Wiand starts with the legal premise that "the party moving to compel arbitration must establish the existence of a binding agreement" whose validity is determined by state law.  *See* Receiver's Opposition at p. 7 citing *Schoendorf v. Toyota of Orlando,* No. 6:08-cv-767-orl-19DAB, 2009 WL 1075991, at *7 (M.D. Fla. April 21, 2009) (the party seeking to compel arbitration "bears the burden to prove the existence of the agreement").[13]  Building on

_____

[13]  *Schoendorf* involved a Fair Labor Standards Act claim about overtime compensation.  The defendant asserted the plaintiff had signed an employment contract agreeing to arbitrate all disputes between them; the plaintiff denied this.  After an evidentiary hearing, the court concluded the defendant had failed to prove a valid agreement existed.  *Schoendorf*'s requirement that the party moving to compel arbitration must establish the existence of a binding agreement between the parties must be read in the context of its

that premise, and borrowing from *Buckeye's* examples, Wiand attacks the validity of the Defendants' proffered agreements by asserting the Defendants "have not shown" or "cannot show" that the parties mutually assented to arbitration or that the fund managers had authority to execute the "scheme offering documents." *See* Receiver's Opposition at pp. 6-12.  Since the Defendants cannot prove their agreements are valid, Wiand posits their motions to compel arbitration should therefore be denied.  This argument is a syllogistic sleight of hand.  Wiand's major premise – a movant must show a "binding agreement" exists – is applied too broadly; and his minor premise – the Defendants "cannot show" their arbitration agreements are valid – is faulty because it distorts the Defendants' minimal burden of production and Wiand's ultimate burden of production and persuasion for showing that § 2's exceptions apply.[14]

To meet their proof threshold, each Defendant submits a Hedge Fund document evidencing an arbitration provision or affirms by affidavit entering into an arbitration agreement. Wiand does not deny the existence of the agreements.  Rather, he attacks their legality.  Namely, he maintains the Hedge Fund documents were "bogus" from their inception, created solely as

---

narrow factual pattern.  I do not read it to require a movant to make out more than a *prima facie* showing that an agreement between the parties *existed*.  Wiand, however, reads more into *Schoendorf* by arguing the Defendants must prove not only the agreement's existence but also *its validity*.  That tack contravenes *Buckeye's* second proposition.

[14]  The burden of production is the obligation to come forward with the necessary propositions of fact; the burden of persuasion is the obligation to convince the fact-finder these propositions are true.  *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 n. 6 (3rd Cir. 2007).  *See also* WRIGHT & GRAHAM, FEDERAL PRACTICE & PROCEDURE: EVIDENCE 2D § 5122 (2005).

"scheme offering" papers to facilitate "a massive fraud."[15]  Imbued with this *ultra vires* quality,

he argues none of the Defendants can show a legally cognizable "mutual assent" between the

parties.  Nor can any Defendant prove an authorized Hedge Fund representative signed the

requisite document or acted consistent with the authority granted by the "agreement."  In short,

none of the "scheme offering documents reflect[] any contract," or at least one that society

should enforce.  *See* Receiver's Opposition at pp. 6-12.  These arguments are wrong for two

reasons.  Wiand places too demanding a burden on the Defendants, and he attacks the validity

of the agreements as a whole, as opposed to the validity of the arbitration clauses within those

agreements.

By asserting the Defendants "cannot show" a binding agreement, Wiand distorts their

proof burden.  The Defendants face a *prima facie* burden of production for establishing *the*

*existence* of a *presumptively* valid arbitration agreement.  *Chastain*, 957 F.2d at 854 ("[u]nder

such circumstances, the parties have at least presumptively agreed to arbitrate any disputes,

including those disputes about the validity of the contract *in general*.") (emphasis in original);

*see also Bess v. Check Express*, 294 F.3d 1298, 1305-06 (11th Cir. 2002) (plaintiff challenges

the content of the contracts and not their existence; thus, "case falls within the 'normal

circumstances' described in *Chastain*, where the parties have signed a *presumptively valid*

agreement to arbitrate any disputes …") (emphasis added).  Each Defendant met that demand.

Wiand, by opposing arbitration, then must come forward "by way of affidavit or allegation of

---

[15] *See* Receiver's Opposition at p. 2.

10

fact to show cause why the court should not compel arbitration," a burden that is not unlike a

party seeking summary judgment. *Aronson v. Dean Witter Reynolds, Inc.*, 675 F. Supp. 1324,

1326 (S.D. Fla. 1987).[16]   Therefore, to the extent Wiand contends that a particular Defendant

cannot prove the *existence* of an agreement, Wiand fails to offer the requisite factual affidavits

countering the presumptive record. *Chastain*, 957 F.2d at 855 ("A party cannot place the making

of an arbitration agreement in issue simply by opining that no agreement exists.  Rather, that

party must substantiate the denial of the contract with enough evidence to make the denial

colorable.").[17]   Besides, and as the Defendants urge, Wiand cannot as the Hedge Funds'

representative "assert the existence of the Hedge Funds, yet deny the existence of the

organizational documents."   *See* Defendants' omnibus reply to the Receiver's omnibus

---

[16]   The Eleventh Circuit approved of *Aronson's* approach in *Brown v. Dean Witter Reynolds, Inc.*, 882 F.2d 481 (11th Cir. 1989).  This method also comports with *Green Tree* and *Gilmer's* allocation of the burden (i.e., on the party opposing arbitration to show 9 U.S.C. § 2's exceptions apply).  *Green Tree,* 531 U.S. at 91-92; *Gilmer,* 500 U.S. at 26.

[17]   As noted previously, *Chastain* says that in most instances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration because the parties have "at least presumptively agreed to arbitrate any disputes." *Id.* at 854.  Moreover, "[b]ecause the making of the arbitration agreement *itself* is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests." *Id.* (emphasis in original).  The plaintiff in *Chastain*, like the plaintiff in *Schoendorf*, denied signing any agreement with defendant, said her signature was a forgery, and provided a detailed affidavit to that effect.  The defendant ultimately agreed with her position.  The court denied arbitration because no arbitration agreement existed.  *Chastain's* factual setting, as the Eleventh Circuit has remarked, is "unique" or "unusual." *Bess*, 294 F.3d at 1305 ("unique"); *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 881 (11th Cir. 2005) ("unusual").  Wiand's factual assertions are neither unique nor unusual.

opposition to Defendants' motions to compel arbitration at p. 3.[18]  To the extent Wiand contends a Hedge Fund representative's failure to sign the relevant contract makes the arbitration agreement unenforceable, the FAA's text forecloses the argument.  The plain language of the FAA requires the arbitration provision to be "written"; it does not require the agreement to be signed by either party.  *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368-69 (11th Cir. 2005).  Wiand's claims regarding the existence of the arbitration agreements, or more precisely, the lack thereof, are not colorable.

Wiand next attempts to fit his mutual assent and *ultra vires* claims into *Chastain's* box by asserting the Hedge Funds' "scheme-offering" contracts had no legal existence as each was void *ab initio* per Florida law.  Those challenges, however, go to the validity of an entire contract, not just its arbitration clause, and *Buckeye's* first and second propositions foreclose that approach: an arbitration clause, as a matter of substantive federal arbitration law, is severable from the remainder of the contract; and unless the challenge is to the arbitration clause itself, the issue of the contract's validity is to be considered by the arbitrator.  546 U.S. at 445-46.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), as *Buckeye* noted, did away with the distinction between void and voidable contracts.  *Buckeye*, 546 U.S. at 446; *see Prima Paint*, 388 U.S. at 407 (J. Black in dissent: "The Court here holds that [the FAA], as a matter of federal substantive law, compels a party to a contract containing a written arbitration provision to carry

---

[18]  This omnibus reply was filed by the Defendants in the following cases: 8:10-cv-130-T-17MAP, 8:10-cv-157-T-17MAP, 8:10-cv-161-T-17MAP, 8:10-cv-170-T-17MAP, 8:10-cv-176-T-17MAP, 8:10-cv-179-T-17MAP, 8:10-cv-181-T-17MAP, 8:10-cv-185-T-17MAP, 8:10-cv-212-T-17MAP, 8:10-cv-223-T-17MAP, and 8:10-cv-226-T-17MAP.

out his 'arbitration agreement' even though a court might, after a fair trial, hold the entire contract – including the arbitration agreement – void because of fraud in the inducement."). Because Wiand's challenges go to the legal formation of the agreements, they are for the arbitrators to consider. *Preston v. Ferrer,* 552 U.S. 346, 354 (2008) (*Buckeye* "resolves the dispute before us" as Ferrer sought "invalidation of the contract as a whole" and "made no discreet challenge to the validity of the arbitration clause"); *Jenkins*, 400 F.3d at 880-82 (per *Prima Paint*, issues as to whether payday loan contracts were illegal and void *ab initio* under Georgia law were for arbitrator, not court, to decide); *Bess, supra,* 294 F.3d 1306 (rejecting void *ab initio* argument as fitting within *Chastain's* model); *see also*: *Moran v. Svete*, 366 Fed. App'x 624, 632 (6th Cir. 2010) (rejecting receiver's argument that signor to contract acted *ultra vires* because actions breached fiduciary duty owed to corporation; per *Buckeye* and *Prima Paint* receiver's challenge is to validity rather than existence of contract); *Bd. of Cnty. Comm'rs of Lawrence Cnty., Ohio v. Kimball,* 860 F.2d 683, 685 (6th Cir. 1989) (*ultra vires* argument for arbitrator to decide).

### b. contracts bind Wiand

Even assuming the "scheme offering documents were binding on the Hedge Funds," Wiand contends "they are not binding on [him]" because an agreement made with the intent to defraud is invalid and not enforceable after the appointment of a receiver. *See* Receiver's Opposition at pp. 22-23 citing *Hodgson v. Kottke Assoc., LLC*, Civil Action No. 06-5040, 2007 WL 2234525, *6-8 (E.D. Pa. Aug. 1, 2007). *Hodgson*, which did not deal with the FAA, is simply inapplicable. Wiand is in no better position than the Hedge Funds; he acts in their place,

even if they are nominal parties, and manages their assets "in the same manner that [its] owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). Thus, the arbitration agreements that bind the Hedge Funds also bind him. Again, Wiand's invalidity claim here attacks the *whole* contract and not just the arbitration clause within the contract. For the reasons just explained, *Prima Paint* and its progeny dictate the argument's rejection.

### c.  the subsets – Vahalla and Scoop

Wiand contends his claims relating to transfers from Valhalla Investment Fund cannot be compelled to arbitration because (1) Valhalla Investment Fund does not have an agreement to arbitrate with Defendants and (2) to the extent any such agreement exists, the language of the pertinent arbitration provision limits the arbitrators' authority to construing and enforcing the terms and conditions of the agreements.[19] Similar to the other Hedge Funds, Valhalla Investment Fund issued both Subscription Documents and a Limited Partnership Agreement. Unlike most of the other Hedge Funds, however, the Subscription Documents do not contain a provision relating to arbitration. Instead, Valhalla Investment Fund's Limited Partnership Agreement contains the only arbitration provision, which provides:

> Section 10.10 <u>Arbitration</u>.  All controversies arising in connection with the Partnership's business and between or among the Partners, shall be settled by arbitration, to be held in the City of Chicago, State of Illinois, under the then prevailing rules of the American Arbitration Association. In any such arbitration, each of the parties hereto agrees to request from the arbitrators that (a) their authority be limited to construing and enforcing the terms and conditions of the

---

[19]  As noted in appendix B, the following cases involve investors of the Valhalla Investment Fund: 8:10-cv-130-T-17MAP, 8:10-cv-157-T-17MAP, 8:10-cv-161-T-17MAP, 8:10-cv-203-T-17MAP, 8:10-cv-212-T-17MAP, and 8:10-cv-223-T-17MAP.

14

> Agreement as expressly set forth herein, (b) the reasons for their award be stated in a written opinion, (c) they shall not make any award which shall alter, change, cancel or rescind any provision of this Agreement, and (d) their award shall be consistent with the provisions of this Agreement. The award of the arbitrators shall be final and binding, and judgment may be confirmed and entered thereon in any court of competent jurisdiction.

The Limited Partnership Agreement defines the term "Partners" to encompass the "General Partners," which includes Valhalla Management, and the "Limited Partners," which includes Defendants. Additionally, the Limited Partnership Agreement states that it is made and entered into between the undersigned parties, meaning the General Partner and the Limited Partner.

Given the terms of the Limited Partnership Agreement, Wiand reads the arbitration provision as requiring only the "Partners" to arbitrate, not the limited partnership entity, *i.e.* Valhalla Investment Fund. As further evidence that Valhalla Investment Fund should not be bound by the arbitration provision, Wiand points to the language used in some of the other Hedge Funds' arbitration provisions wherein they explicitly provided for arbitration of all controversies which may arise between the investor and the Partnership (Hedge Fund) or the General Partner. According to Wiand, if Valhalla Investment Fund wanted to be bound by the arbitration agreement, it would have used language similar to the provisions found in the other Hedge Funds' provisions. The failure to do so indicates to Wiand that Valhalla Investment Fund is not required to arbitrate. Since Valhalla Investment Fund is not required to arbitrate, Wiand argues he, as the receiver standing in the shoes of Valhalla Investment Fund, should similarly not be required to arbitrate. He contends an interpretation to the contrary is absurd given the plain language of the provision. In addition, Wiand argues, under the terms of the arbitration

15

provision, the arbitrators' authority is limited to contract construction and enforcement.  Since

his claims do not pertain to contract construction or enforcement, Wiand contends the claims are

outside the scope of the arbitration provision.

I disagree.  The arbitration provision could not be broader, and Wiand's arguments to the

contrary are unavailing.  Indeed, according to the plain language of the arbitration provision, "all

controversies" arising in connection with the Partnership's business are arbitrable.  Read simply,

all controversies means any and all controversies.  *Anders v. Hometown Mortg. Servs., Inc.*, 346

F.3d 1024, 1028 (11th Cir. 2003) ("Any disputes means all disputes, because 'any means all.'"

(citation omitted)).  As defined in the Limited Partnership Agreement, the "Partnership's

business" entails the following:

> Section 1.2 <u>Purpose.</u>  The Partnership's business and purpose is to seek capital
> appreciation through investing and active trading in securities ... to engage in
> such other Securities-related activities or transactions as determined in good faith
> by the General Partner from time to time; to lend or borrow funds and Securities
> (in each case, secured or unsecured and in such amounts and on such terms as
> determined in good faith by the General Partner from time to time); to open and
> close accounts with brokers or dealers; and to conduct such other activities and
> retain such agents, independent contractors, attorneys, accountants and
> investment counselors as determined by the General Partner to be necessary, in
> the best interests of the Partnership, advisable, desirable or incidental to carrying
> out the purposes of the Partnership.

The current controversy arose in connection with the Partnership's business and is, therefore,

arbitrable pursuant to the arbitration provision.  Further, as to the extent of the arbitrator's

authority, that issue is left to the parties to address with the arbitrator during arbitration pursuant

to the plain language of the provision.

Wiand sets forth essentially the same arguments with respect to Scoop Real Estate

16

Fund.[20]  As with Valhalla Investment Fund, Scoop Real Estate Fund issued both Subscription Documents and a Limited Partnership Agreement, but only the latter contained an arbitration provision.  The Scoop Real Estate Limited Partnership Agreement arbitration provision provides:

### 15.2    Arbitration

(a) Any controversy, dispute or claim arising under this Agreement or any breach thereof shall be settled by arbitration conducted in Sarasota, Florida in accordance with the then existing rules of the American Arbitration Association, provided that the foregoing shall not limit the Fund's right to seek an injunction or other equitable relief.  Any such arbitration shall be conducted by a single arbitrator, and, in the case of any dispute with respect to accounting issues, the arbitrator shall be a partner of a reputable accounting firm other than the Fund's accountants.  If the parties are unable to agree upon an arbitrator, then an arbitrator shall be appointed in accordance with the rules of the American Arbitration Association.  The parties intend that this agreement to arbitrate be valid, enforceable and irrevocable and that any determination reached pursuant to the foregoing procedure shall be final and binding on the parties absent fraud.  The costs and expenses of any such arbitration including both legal fees of the parties to the arbitration and all of the fees and expense [*sic*] of the arbitrator shall be paid by such person as the arbitrator designates as the party who did not substantially prevail on the majority of the material claims in such arbitration.

(b) The parties consent to the nonexclusive jurisdiction of the Supreme Court of the State of Florida, and of the United States District Court for the Southern District of Florida, for all purposes in connection with any such arbitration.  The parties agree that any process or notice of motion or other application to either of such courts, and any paper in connection with any such arbitration, may be served by certified mail, return receipt requested, or by personal service or in such other manner as may be permissible under the rules of the applicable court or arbitration tribunal, provided a reasonable time for appearance is allowed.

**THE LIMITED PARTNERS WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO ENFORCE**

---

[20]    As noted in appendix B, the following cases involve investors of the Scoop Real Estate Fund: 8:10-cv-161-T-17MAP, 8:10-cv-170-T-17MAP, 8:10-cv-185-T-17MAP, and 8:10-cv-226-T-17MAP.

**OR DEFEND ANY RIGHTS OR REMEDIES UNDER THE LIMITED PARTNERSHIP AGREEMENT OR ANY DOCUMENTS RELATED THERETO.**

Similar to Valhalla Investment Fund, the Scoop Real Estate Fund Limited Partnership Agreement states it is made and entered by and among Scoop Capital, LLC as the "General Partner" and the Investors, *i.e.* the Defendants in this action.  The signature page indicates the undersigned executed the Limited Partnership Agreement on its own behalf as General Partner and on behalf of the Investors.  Unlike Valhalla Investment Fund, however, the Scoop Real Estate Fund Limited Partnership Agreement explicitly identifies itself as the entire agreement, other than the Subscription Agreement, among the Fund and the Limited Partners.  Specifically, it provides:

> **15.8  Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Limited Partners (and their spouses if the Interests of such Limited Partners shall be community property) as well as their respective permitted assigns.  This Agreement constitutes the entire agreement among the Fund and the Limited Partners with respect to the formation and operation of the Fund, other than the Subscription Agreement entered into between the Fund and each Investor.

Given the binding effect of the entire Limited Partnership Agreement on Scoop Real Estate Fund, Wiand's attempt to limit the application of the arbitration provision to the General Partner and Defendants fails.  Further, Wiand's interpretation of the scope of the provision is too narrow.  The arbitration provision provides that *any* controversy, dispute or claim arising under this Agreement or any breach thereof shall be settled by arbitration.  *See Anders*, 346 F.3d at 1028 ("Any disputes means all disputes, because 'any means all.'" (citation omitted)).  Wiand's claims arise under the Limited Partnership Agreement and are arbitrable pursuant to the plain

18

language of the arbitration provision.  Any interpretation to the contrary is implausible.

### d.  statutory schemes, costs, and commingled funds

Wiand next argues that the statutory context surrounding his appointment as receiver inherently conflicts with Congress's policy favoring arbitration.  To support his claim that the former trumps the latter, Wiand points to 28 U.S.C. §§ 754 and 1692, two provisions expanding a receiver's and the receivership court's operational and jurisdictional breadth.  Section 754, for example, gives a receiver complete jurisdiction over property located within the jurisdiction of his appointment.  And a receiver can obtain jurisdiction of receivership estate property (real or personal) located outside the receivership court's district by filing a copy of the complaint and the order of appointment in the district court where the property is located within 10 days of his appointment.  That section, when it applies, triggers § 1692, which effectively expands the territorial jurisdiction of the court which appoints the receiver to any district in the United States where property believed to be that of the receivership estate is found, provided the receiver files in each district the documents § 754 requires.  28 U.S.C. §§ 754, 1692; *see generally,* PHILLIP S. STENGER, RECEIVERSHIP SOURCEBOOK (4TH ED. 2009) at pp. 12-13.  These statutes, Wiand maintains, present policy considerations evincing a Congressional intent against arbitration here. Instead of a managing claims regarding receivership property in a single forum, an order enforcing arbitration would effectively disperse these clawback actions to multiple arbitral forums and arbitrators.  Not only could arbitration lead to conflicting decisions, so Wiand contends, arbitration would diminish the Court's governance over the receivership estate.

The Defendants dismiss these claims.  Only a showing that "Congress intended to

preclude a waiver of judicial remedies for the statutory rights at issue" can thwart the arbitration presumption the case law demands. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226-27 (1987). Wiand's reliance on §§ 754 and 1692, they argue, is misplaced, as these statutes merely grant the receivership court complete but not exclusive jurisdiction. Further, Wiand, per 28 U.S.C. § 959(b), is bound to manage the Hedge Funds in the same manner as its owner would be.

As the Defendants posit, *McMahon* guides the analysis. It sets out three factors for deducing Congressional intent: (1) the text of the statute; (2) its legislative history; and (3) whether "an inherent conflict between arbitration and the statute's underlying purposes" exists. *Id.* at 227. The party opposing arbitration bears the burden of showing Congress intended to preclude arbitration of the statutory claim. *Id.*; *Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268, 1273 (11th Cir. 2002) (applying test). And as *Davis* observed, that burden is daunting: "[i]n every statutory right case that the Supreme Court has considered, it has upheld binding arbitration if the statute creating the right did not *explicitly* preclude arbitration." 305 F.3d at 1273 (emphasis in original). These twenty-three cases follow the norm.

The backdrop for Wiand's appointment as receiver is the SEC's action to enforce the Securities Act of 1933 and the Securities and Exchange Act of 1934. But those Acts offer no cover as the Supreme Court has specifically condoned arbitration for causes of action arising under both. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) (Securities Act of 1933); *McMahon*, 482 U.S. 220 (Securities and Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act). Hence, any argument that these statutory

20

schemes are difference-makers fails.  This leaves 28 U.S.C. § 959(b).  Because nothing in its text

or legislative history speaks to arbitration, Wiand's argument is limited to *McMahon*'s third

prong: whether an inherent conflict exists between arbitration and the underlying purposes of a

receivership.  A review of the principles governing a receiver and his overseer (the receivership

court) shows no conflict.

A receiver, like Wiand, is a creature of equity.  *Gulf Ref. Co. of La. v. Vincent Oil Co.,*

185 F. 87 (5th Cir. 1911).[21]  Appointed by the court and considered an officer of the court, the

receiver's task is to take control and custody of the subject property and manage it within 28

U.S.C. § 959(b)'s broad confines, namely: "in the same manner that [its] owner or possessor

thereof would be bound to do if in possession thereof."  Nonetheless, the receiver's authority is

tied to the court's equitable perceptions.  As one commentator observes, "the case law

surrounding receiverships clearly and repeatedly demonstrates that the receiver's powers in

operating the estate are extraordinary and virtually only limited by the district judge's concept

of equity."  RECEIVERSHIP SOURCEBOOK, *supra*, at p. 7.

At the SEC's specific request, the district judge in the enforcement action appointed

Wiand as receiver per the "well-established equitable remedy" available to the SEC in such

actions.  *SEC v. First Fin. Group of Texas,* 645 F.2d 429, 438 (5th Cir. Unit A 1981).  The

district judge empowered Wiand to take immediate possession of the assets and property of

---

[21]  The concept traces back to Elizabethan times when a chancery court appointed a
receiver to protect property interests from being wasted by the party in possession. *See*
WRIGHT, MILLER, & MARCUS, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2981.

"every kind" of Scoop Capital LLC, Scoop Management, and the relief defendants whom Wiand represents in these clawback actions.  He also directed Wiand to conduct and institute such actions and legal proceedings against others "for the benefit and on behalf of [Nadel, Scoop Capital LLC, and Scoop Management, Inc.] and [the] Relief Defendants and their investors and other creditors as [Wiand] deems necessary."[22]  These clawback cases emanate from that broad directive.

But the receivership is "never an end in itself"; it "is only a means to reach some legitimate end sought through the exercise of the power of the court of equity." *Tucker v. Baker,* 214 F.2d 627, 631 (5th Cir. 1954) quoting *Gordon v. Washington*, 295 U.S. 30, 37 (1935).  Because Wiand's receivership is ancillary to the enforcement action, that proceeding's goal is the key: "the primary job of the district court [in supervising an equitable receivership] is to ensure the proposed plan of distribution is fair and reasonable." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010).  And to that end, the Court's oversight obligation is to "watch[] [the receivership] with jealous eyes lest [his] function be perverted." *Tucker,* 214 F.2d at 631.

Wiand's argument that an arbitral forum is unsuitable for litigating the merits of a clawback case rests on the notion that a securities enforcement action is the difference-maker here.  Namely, the SEC's goals in enforcing the provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, Wiand's role in that enforcement action, and the Court's role in supervising Wiand and overseeing the receivership estate all make arbitration inappropriate.

---

[22]  *See SEC v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM at doc. 8.

But as already noted, the Supreme Court has rejected this argument by holding that actions for violations under these Acts can be arbitrated. *Rodriguez de Quijas* and *McMahon*, *supra.* These cases adhere to the liberal federal policy favoring arbitration agreements by dictating the applicable principle: "claims arising under a statute designed to further important social policies may be arbitrated because 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum,' the statute serves its function." *Green Tree, supra,* 531 U.S. at 90 quoting *Gilmer,* 500 U.S. at 28. From that perspective, an arbitral forum clearly gives Wiand the ability to vindicate his mandate. And in the end, Wiand must still answer to the district judge in the enforcement action, who will ensure that the proposed plan of distribution is fair, reasonable, and in keeping with the enforcement action's goals. *Wealth Mgmt. LLC*, *supra.*

Alternatively, Wiand says the arbitral costs will unduly dissipate the estate assets; for example, he totals the arbitral administration fees for these twenty-three cases at more than $100,000.[23] *See* The Receiver's Omnibus Supplemental Memorandum of Law in Opposition to Defendants' Motions to Compel Arbitration, pp. 6-7. Litigating these claims in this Court, he counters, will be less. Perhaps he is correct. But, his contention is just a guess. It presumes, to a degree, that all these cases, if they were to remain in the Court's forum, will be resolved short of trial. Or that the attorneys' fees he would expend in this Court would not exceed his arbitral fees and costs. Given that these parties have unsuccessfully mediated their disputes,

---

[23] Both JAMS and the AAA, however, include provisions allowing arbitrators as part of the award to impose fee-sharing obligations on the parties.

23

Wiand's assumption may be too optimistic.   Irrespective, should some, most, or all these Defendants proceed to a trial in this Court, Wiand's assumptions would likely be wrong.   No matter, the applicable test does not ask which forum will be less costly for the parties.   *Green Tree* requires that Wiand show the arbitral costs are likely "prohibitively expensive."   531 U.S. 522-523.   And "prohibitively expensive" has a distinct meaning – Wiand would have to show that enforcement of the agreement would "preclude" him from "effectively vindicating his federal statutory right in the arbitral forum."   *Musnick v. King Motor Co. of Ft. Lauderdale*, 325 F.3d 1255, 1259 (11th Cir. 2003), quoting *Green Tree Financial*, 531 U.S. at 90.   Absent such a showing, the agreement may be enforced.   *Id.* at 1259.   Wiand fails to make the required showing.[24]

Lastly, Wiand says that arbitration is inappropriate because Nadel commingled investor funds and paid these Defendants false profits from that common pool.   Consequently, Nadel's nondiscriminating use of the six Hedge Funds implicates more than just a Defendant's contractually associated Hedge Fund (and particular "relief defendant").   From this, Wiand concludes a subset of relief defendants' claims might be arbitrable but others would not because

---

[24]   An agreement to arbitrate "just like any other contract ..., may be waived."   *Ivax Corp. v. B. Braun of America, Inc.* 286 F.3d 1309, 1315 (11th Cir. 2002) (citation omitted). A substantial number of the defendants in the more than 150 clawback actions pending in this division have effectively waived that right by settling their claims with Wiand.   Obviously, these settlements have no consequence to the issues confronting the Court other than to underscore that decisions about whether to litigate and where to litigate are, in part, economic ones.   The Defendants in these twenty-three clawback cases, by seeking to enforce their arbitration agreements, are hoping their costs will be less and their outcomes more favorable than if they were to remain here.   But that, too, is conjecture.

the Defendants did not enter contracts (and therefore did not agree to arbitrate) with all six Hedge Funds.  *See* Receiver's Omnibus Supplemental Memorandum of Law in Opposition to Defendants' Motions to Compel Arbitration, pp. 36-39.  His math says his exposure to arbitration is "only a fraction of each case," and he should be able to litigate any Defendant's balance in a judicial forum.  *Id.* at 37.  Taken to its reasonable conclusion, Wiand's math would suggest that each two-count complaint (i.e., FUFTA and unjust enrichment) against a Defendant is really a twelve-count action (two counts per Hedge Fund).  Some of those claims would go to arbitration; others would stay here.  Despite the fractional permutations, Wiand's argument is without merit.

These clawback actions center on a contractual agreement between a Defendant and the relevant Hedge Fund.  No party seriously disputes the existence of these agreements.  And no party disputes that Wiand collectively represents the "relief defendants" per his appointment as receiver in the enforcement action.  Should Wiand be successful against a Defendant in an arbitral forum and collect an award, Wiand will be duty bound to pour those proceeds into the receivership pot for eventual distribution as ordered by the district judge overseeing the enforcement action.  Nothing about that process is inconsistent with Wiand's mandate.  He is not entitled to fractionally separate his causes of action against a Defendant, and his arguments on this score have no merit.

*C.  Conclusion*

For the reasons stated, I recommend the district judge per 9 U.S.C. § 4 grant the Defendants' motions to compel arbitration and direct the parties to proceed to arbitration in

accordance with their respective agreements.[25]  I also recommend the district judge per 9 U.S.C.

§ 3 stay each action and direct the Clerk to terminate any pending motions in these cases and

administratively close each case.[26]

IT IS SO REPORTED in Tampa, Florida, on June 7, 2011.

*Mark A. Pizzo*

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

---

[25]  Appendix A attached to this report identifies the relevant case number, Defendant, and document number for each motion to compel.

[26]  The Defendants move for dismissals or alternatively for stays of their actions.  I recognize that the "weight of authority" supports a dismissal when "*all* of the issues" raised in the district court are covered by arbitration.  *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (emphasis in original); *see also*: *Choice Hotels Int'l Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000); *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 156 n. 21 (1st Cir. 1998); *Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 638 (9th Cir. 1988); *see also Gilchrist v. Citifinancial Servs.,* Inc., No. 6:06-cv-1727-Orl-31KRS, 2007 WL 177821, at *4 (M.D. Fla. Jan. 19, 2007) (citing *Alford* and opining the Eleventh Circuit would decide similarly given its affirmances of district court dismissals).  Nonetheless, 9 U.S.C. § 3 states that a district court "shall on application of one of the parties *stay* the trial of the action until … arbitration has been had in accordance with the terms of the agreement…."  (emphasis added).  The Third Circuit, contrary to the majority position, takes this language literally by holding the FAA does not afford the district court discretion to dismiss a case where one of the parties applies for a stay pending arbitration.  *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3rd Cir. 2004).  In view of this split, and because the Eleventh Circuit has not specifically addressed the issue, I recommend the Court adhere to the text of the statute and stay these actions.

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).

cc:     The Honorable Elizabeth A. Kovachevich
        Counsel of Record

Appendix A

| CASE NUMBER | DEFENDANT(S) | FUND(S) | MOTION |
|---|---|---|---|
| 8:10-CV-71-T-17MAP | (1) Peter Roby<br>(2) Katherine Roby | Viking Fund | Doc. 20 |
| 8:10-CV-96-T-17MAP | Charles A. Hailey | Viking Fund | Doc. 21 |
| 8:10-CV-97-T-17MAP | Gregg Weinberg, as Trustee of the Commonwealth Radiology, PC Profit-Sharing Plan | Viking Fund | Doc. 18 |
| 8:10-CV-119-T-17MAP | John D. Whitlock | Victory Fund | Doc. 21 |
| 8:10-CV-123-T-17MAP | Rodney Nigel Turner | Viking Fund | Doc. 22 |
| 8:10-CV-125-T-17MAP | W.W. Whitlock Foundation | Viking Fund | Doc. 21 |
| 8:10-CV-130-T-17MAP | Ellen Schwab | Valhalla Investment Fund | Doc. 20 |
| 8:10-CV-134-T-17MAP | Paul Swenson | Viking IRA Fund | Doc. 22 |
| 8:10-CV-157-T-17MAP | (1) Edward Steinhauser<br>(2) Diane Schwab | Valhalla Investment Fund | Doc. 19 |
| 8:10-CV-161-T-17MAP | Daniel A. Zak, individually and as Trustee of the EPMG - NW P.C. MPP & PS Trust | Valhalla Investment Fund, Scoop Real Estate Fund | Docs. 19, 39 |
| 8:10-CV-170-T-17MAP | Marian Zak, as Trustee of the Marvin Zak and Marian Lyle Zak Bypass Trust U/A dtd 10/16/1998 | Scoop Real Estate Fund | Doc. 18 |
| 8:10-CV-171-T-17MAP | (1) Harvey A. Gilbert, as Co-Trustee of the Gilbert Family Trust<br>(2) Deanne E. Gilbert, as Co-Trustee of the Gilbert Family Trust | Viking Fund | Doc. 22 |

i

| 8:10-CV-176-T-17MAP | Richard E. Russell, individually and as Trustee of the Richard E. Russell Revocable Living Trust | Viking IRA Fund, Victory Fund | Doc. 18 |
|---|---|---|---|
| 8:10-CV-179-T-17MAP | Mayfair Associates | Viking Fund | Doc. 22 |
| 8:10-CV-180-T-17MAP | John D. Whitlock, as Trustee of the W.W. Whitlock PC Pension Trust | Viking Fund | Doc. 21 |
| 8:10-CV-181-T-17MAP | (1) Roberta Schneiderman, as Co-Executor of the Estate of Herbert Schneiderman (2) Robert D. Zimelis, as Co-Executor of the Estate of Herbert Schneiderman | Victory Fund | Doc. 21 |
| 8:10-CV-184-T-17MAP | (1) John Whitlock, as Co-Trustee of the Edward J. Whitlock, Jr. Marital Trust Two (2) Thomas Luck, as Co-Trustee of the Edward J. Whitlock, Jr. Marital Trust Two | Victory Fund | Doc. 22 |
| 8:10-CV-185-T-17MAP | Walter L. Schwab, as Trustee of the Walter L. Schwab Revocable Trust dtd 10/23/1991 | Scoop Real Estate Fund | Doc. 21 |
| 8:10-CV-203-T-17MAP | World Opportunity Fund, L.P. | Valhalla Investment Fund | Doc. 24 |
| 8:10-CV-212-T-17MAP | The Carrswold Partnership | Valhalla Investment Fund, Victory Fund, Viking Fund | Doc. 19 |
| 8:10-CV-218-T-17MAP | Kathryn Lawrence | Viking IRA | Doc. 20 |

| 8:10-CV-223-T-17MAP | (1) Dominique Schmidt<br>(2) Caroline Schwab | Valhalla Investment Fund | Doc. 19 |
| 8:10-CV-226-T-17MAP | Betty Bry Schwab, as Trustee of the Betty Bry Schwab Revocable Trust | Viking Fund, Scoop Real Estate Fund | Doc. 23 |

Appendix B

*Viking Fund* [27]

Viking Fund issued both Subscription Documents and a Limited Liability Company

Agreement.  The Viking Fund Subscription Documents contain an arbitration provision, which

provides:

> **21.    Arbitration.  The parties irrevocably waive their right to seek remedies in court, including any right to a jury trial.**  The parties agree that in the event of any dispute between the parties arising out of, relating to or in connection with this Subscription Agreement or the Company, such dispute shall be resolved exclusively by arbitration to be conducted only in the County, City and State of New York in accordance with the rules of JAMS/Endispute ("JAMS") applying the laws of Delaware.  Disputes shall not be resolved in any other forum or venue.  The parties agree that such arbitration shall be conducted by a retired judge who is experienced in resolving disputes regarding the securities business, that discovery shall not be permitted except as required by the rules of JAMS, that the arbitration award shall not include factual findings or conclusions of law, and that no punitive damages shall be awarded.  The parties understand that any party's right to appeal or to seek modification of any ruling or award of the arbitrator is severely limited.  Any award rendered by the arbitrator shall be final and binding, and judgment may be entered on it in any court of competent jurisdiction in the County, City and State of New York or as otherwise provided by law.

The Defendants investing in Viking Fund were signatories to the Viking Fund Subscription

Documents.  By signing the Viking Fund Subscription Documents, Defendants were bound to

the terms of the Viking Fund Limited Liability Company Agreement.  Indeed, the Viking Fund

Subscription Documents provide:

---

[27]  The following cases involve investors of the Viking Fund: 8:10-cv-71-T-17MAP, 8:10-cv-96-T-17MAP, 8:10-cv-97-T-17MAP, 8:10-cv-123-T-17MAP, 8:10-cv-125-T-17MAP, 8:10-cv-171-T-17MAP, 8:10-cv-179-T-17MAP, 8:10-cv-180-T-17MAP, 8:10-cv-212-T-17MAP, and 8:10-cv-226-T-17MAP.

i

**8. <u>Acceptance of LLC Agreement.</u>**  Subscriber agrees that Subscriber (a) shall become a Member as of the date of entry of Subscriber's name as a Member on the books and records of the Company and (b) shall be bound by each and every term of the LLC Agreement.

In addition, the Viking Fund Limited Liability Company Agreement contains a nearly identical arbitration provision to the one found in the Viking Fund Subscription Documents, and states:

**14.3    Arbitration.  The parties waive their right to seek remedies in court, including any right to a jury trial.**  The parties agree that in the event of any dispute between the parties arising out of, relating to or in connection with this Agreement or the Company, such dispute shall be resolved exclusively by arbitration to be conducted only in the county, city and state of New York in accordance with the rules of JAMS/Endispute ("**JAMS**") applying the laws of Delaware.  Disputes shall not be resolved in any other forum or venue.  The parties agree that such arbitration shall be conducted by a retired judge who is experienced in resolving disputes regarding the securities business, that discovery shall not be permitted except as required by the rules of JAMS, that the arbitration award shall not include factual findings or conclusions of law, and that no punitive damages shall be awarded.  The parties understand that any party's right to appeal or to seek modification of any ruling or award of the arbitrator is severely limited.  Any award rendered by the arbitrator shall be final and binding, and judgment may be entered on it in any court of competent jurisdiction in the county, city and state of New York or as otherwise provided by law.

———————————————

*Viking IRA Fund* [28]

Viking IRA Fund issued both Subscription Documents and an LLC Agreement.  The Viking IRA Fund Subscription Documents contain an arbitration provision, which provides:

**21.  <u>Arbitration.  The parties irreversibly waive their right to seek remedies in court, including any right to a jury trial.</u>**  The parties agree that in the event of any dispute between the parties arising out of, relating to or in connection with this

---

[28]   The following cases involve investors of the Viking IRA Fund: 8:10-cv-134-T-17MAP, 8:10-cv-176-T-17MAP, and 8:10-cv-218-T-17MAP.

> Subscription Agreement or the Company, such dispute shall be resolved exclusively by arbitration to be conducted only in Sarasota, Florida in accordance with the rules of JAMS/Endispute ("JAMS") applying the laws of Delaware.  Disputes shall not be resolved in any other forum or venue.  The parties agree that such arbitration shall be conducted by a retired judge who is experienced in resolving disputes regarding the securities business, that discovery shall not be permitted except as required by the rules of JAMS, that the arbitration award shall not include factual findings or conclusions of law, and that no punitive damages shall be awarded.  The parties understand that any party's right to appeal or to seek modification of any ruling or award of the arbitrator is severely limited.  Any award rendered by the arbitrator shall be final and binding, and judgment may be entered on it in any court of competent jurisdiction in the County, City and State of Florida or as otherwise provided by law.

Defendants investing in Viking IRA Fund were signatories to the Viking IRA Fund Subscription Documents.  By signing the Viking IRA Fund Subscription Documents, Defendants were bound to the Viking IRA Fund Limited Liability Company Agreement.   Indeed, the Viking Fund Subscription Documents provide:

> **8.  Acceptance of LLC Agreement**.  Subscriber agrees that Subscriber (a) shall become a Member as of the date of entry of Subscriber's name as a Member on the books and records of the Company and (b) shall be bound by each and every term of the LLC Agreement.

The Viking IRA Fund Limited Liability Company Agreement also includes an arbitration provision:

> **Arbitration.  The parties waive their right to seek remedies in court, including any right to a jury trial.**  The parties agree that in the event of any dispute between the parties arising out of, relating to or in connection with this Agreement or the Company, such dispute shall be resolved exclusively by arbitration to be conducted only in Sarasota, Florida in accordance with the rules of JAMS/Endispute ("**JAMS**") applying the laws of Delaware.  Disputes shall not be resolved in any other forum or venue.  The parties agree that such arbitration shall be conducted by a retired judge who is experienced in resolving disputes regarding the securities business, that discovery shall not be permitted except as required by the rules of JAMS, that the arbitration awards shall not include factual findings or conclusions of law, and that no punitive damages shall be awarded.  The parties understand that any party's right

to appeal or to seek modification of any ruling or award of the arbitrator is severely limited.  Any award rendered by the arbitrator shall be final and binding, and judgment may be entered on it in any court of competent jurisdiction in the state of Florida or as otherwise provided by law.

———————————————

*Victory Fund* [29]

Victory Fund issued both Subscription Documents and a Limited Partnership Agreement.

The Victory Fund Subscription Documents contain an arbitration provision, which provides:

4.7 <u>Applicable Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida applicable to contracts made and to be performed entirely within such state.  The undersigned agrees that all controversies which may arise between the undersigned and the Partnership or the General Partner shall be determined and settled by arbitration pursuant to the rules of the American Arbitration Association.  The venue of any such arbitration shall be in Florida.  Any award rendered therein shall be final and conclusive upon the parties, and a judgment thereon may be entered in any Court of competent jurisdiction.  This paragraph shall survive the expiration of termination of this Agreement.

Defendants investing in Victory Fund were signatories to the Victory Fund Subscription Documents.  By signing the Victory Fund Subscription Documents, Defendants investing in the fund were bound to the terms of the Victory Fund Limited Partnership Agreement.  Indeed, the Victory Fund Subscription Documents provide:

2.5 <u>Authority to Date Partnership Agreement and Certificate of Limited Partnership of the Partnership</u>.  The undersigned hereby authorizes the General Partner to date the Partnership Agreement and the Certificate of Limited Partnership of the Partnership.

Further, the Victory Fund Limited Partnership Agreement also contains an arbitration provision,

---

[29]  The following cases involve investors of the Victory Fund: 8:10-cv-119-T-17MAP, 8:10-cv-176-T-17MAP, 8:10-cv-181-T-17MAP, 8:10-cv-184-T-17MAP, and 8:10-cv-212-T-17MAP.

which states:

> Section 10.10 <u>Arbitration</u>.  All controversies arising in connection with the Partnership's business and between or among the Partners, shall be settled by arbitration, to be held in the City of Sarasota, State of Florida, under the then prevailing rules of the American Arbitration Association.  In any such arbitration, each of the parties hereto agrees to request from the arbitrators that (a) their authority be limited to construing and enforcing the terms and conditions of the Agreement as expressly set forth herein, (b) the reasons for their award be stated in a written opinion, (c) they shall not make any award which shall alter, change, cancel or rescind any provision of this Agreement, and (d) their award shall be consistent with the provisions of this Agreement.  The award of the arbitrators shall be final and binding, and judgment may be confirmed and entered thereon in any court of competent jurisdiction.

_____

*Valhalla Investment Fund* [30]

Valhalla Investment Fund issued both Subscription Documents and a Limited Partnership Agreement.  The arbitration clause in the Valhalla Investment Fund Limited Partnership Agreement provides:

> Section 10.10 <u>Arbitration</u>.  All controversies arising in connection with the Partnership's business and between or among the Partners, shall be settled by arbitration, to be held in the City of Chicago, State of Illinois, under the then prevailing rules of the American Arbitration Association.  In any such arbitration, each of the parties hereto agrees to request from the arbitrators that (a) their authority be limited to construing and enforcing the terms and conditions of the Agreement as expressly set forth herein, (b) the reasons for their award be stated in a written opinion, (c) they shall not make any award which shall alter, change, cancel or rescind any provision of this Agreement, and (d) their award shall be consistent with the provisions of this Agreement.  The award of the arbitrators shall be final and binding, and judgment may be confirmed and entered thereon in any court of competent jurisdiction.

---

[30]  The following cases involve investors of the Valhalla Investment Fund: 8:10-cv-130-T-17MAP, 8:10-cv-157-T-17MAP, 8:10-cv-161-T-17MAP, 8:10-cv-203-T-17MAP, 8:10-cv-212-T-17MAP, and 8:10-cv-223-T-17MAP.

_____

*Scoop Real Estate Fund* [31]

Scoop Real Estate Fund issued both Subscription Documents and a Limited Partnership Agreement.  The Scoop Real Estate Fund Limited Partnership Agreement contains an arbitration provision, which provides:

15.2    Arbitration

(a)  Any controversy, dispute or claim arising under this Agreement or any breach thereof shall be settled by arbitration conducted in Sarasota, Florida in accordance with the then existing rules of the American Arbitration Association, <u>provided</u> that the foregoing shall not limit the Fund's right to seek an injunction or other equitable relief.  Any such arbitration shall be conducted by a single arbitrator, and, in the case of any dispute with respect to accounting issues, the arbitrator shall be a partner of a reputable accounting firm other than the Fund's accountants.  If the parties are unable to agree upon an arbitrator, then an arbitrator shall be appointed in accordance with the rules of the American Arbitration Association.  The parties intend that this agreement to arbitrate be valid, enforceable and irrevocable and that any determination reached pursuant to the foregoing procedure shall be final and binding on the parties absent fraud.  The costs and expenses of any such arbitration including both legal fees of the parties to the arbitration and all of the fees and expense of the arbitrator shall be paid by such person as the arbitrator designates as the party who did not substantially prevail on the majority of the material claims in such arbitration.

(b) The parties consent to the nonexclusive jurisdiction of the Supreme Court of the State of Florida, and of the United States District Court for the Southern District of Florida, for all purposes in connection with any such arbitration.  The parties agree that any process or notice of motion or other application to either of such courts, and any paper in connection with any such arbitration, may be served by certified mail, return receipt requested, or by personal service or in such other manner as may be permissible under the rules of the applicable court or arbitration tribunal, provided a reasonable time for appearance is allowed.

_____

[31]   The following cases involve investors of the Scoop Real Estate Fund: 8:10-cv-161-T-17MAP, 8:10-cv-170-T-17MAP, 8:10-cv-185-T-17MAP, and 8:10-cv-226-T-17MAP.

**THE LIMITED PARTNERS WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THE LIMITED PARTNERSHIP AGREEMENT OR ANY DOCUMENTS RELATED THERETO.**